Ricky and Janice **TURNER**, Individually and as next friend of K.M.T., a Minor, Appellants,

v.

Jonathan **FRANKLIN**, M.D. and Evan **Cohn**, M.D., Appellees.

No. 05–08–00011–CV.

Court of Appeals of Texas, Dallas.

Aug. 13, 2010.

Rehearing Overruled Nov. 9, 2010.

Kirk L. Pittard, Durham & Pittard, LLP, Dallas, TX, for Appellants.

Vernon L. Krueger, Stewart & Stimmel, LLP, R. Brent Cooper, Diana L. Faust, Cooper & Scully, P.C., Ty Bailey, Stinnett Thiebaud & Remington, L.L.P., Dallas, TX, for Appellees.

Before Justices MOSELEY, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice MOSELEY.

For some health care liability claims arising from the provision of "emergency medical care," the claimant must show by a preponderance of the evidence that the defendant deviated from the applicable standard(s) of care "with wilful and wanton negligence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.153 (Vernon 2005).[1] The issues before us on this appeal are: (1) do the plaintiffs' health care liability claims arise from the provision of "emergency medical care" within the meaning of section 74.153; and, if the answer to that question is "yes," then (2) what does "wilful and wanton negligence" mean; (3) can the issue of "wilful and wanton negligence" ever be disposed of through summary judgment; and (4) was it properly disposed of by summary judgment here.

This lawsuit arises out of the medical care that K.M.T., the fourteen-year-old son of appellants Ricky and Janice Turner, received in the emergency department of Presbyterian Hospital in Allen. Even though the summary judgment evidence indicates K.M.T.'s condition was diagnosed and treated as a non-emergency, we conclude the Turners' claims arise from the provision of "emergency medical care" within the meaning of section 74.153.[2] We also conclude that in the context of section 74.153, "wilful and wanton negligence" means "gross negligence." Finally, after reviewing the summary judgment evi-

dence, we affirm the trial court's no-evidence summary judgment as to appellee Evan Cohn, M.D., reverse the trial court's traditional summary judgment as to appellee Jonathan Franklin, M.D., and remand the case for further proceedings.

### BACKGROUND

Shortly after midnight on April 3, 2003, K.M.T. awoke with sudden and severe pain in his lower left abdominal region and swelling in his left testicle. His parents took him to the emergency department of Presbyterian Hospital in Allen. The nurse's notes indicate K.M.T. described his symptoms as nausea and a pain level of "10" on a scale of one to ten. K.M.T. was examined by Franklin, an emergency department physician, who suspected K.M.T. had either testicular torsion or epididymitis. Testicular torsion is a condition whereby the testicle becomes twisted on its own spermatic cord and, if not treated within four to six hours, the testicle will die. Epididymitis is inflammation of the epididymis; it has many of the same symptoms as torsion but is not considered an emergency condition and is treated with antibiotics.

Franklin ordered pain medication for K.M.T. and a scrotal ultrasound in an effort to rule out torsion. A technician performed the ultrasound and called Cohn, the radiologist on call that night, at home to review the images. She told Cohn she observed arterial blood flow in both testicles and she did not see evidence of torsion. After reviewing the ultrasound images from his home, Cohn faxed a report to the emergency department; the report

1. Section 74.153 uses the spelling "wilful," but "willful" is the preferred American spelling. BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE 99, 243 (West 2002); *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2616, 2617 (1993). Except in direct quotations, we use the preferred American spelling.

2. Unless noted otherwise, all references to the "code" or other statutory references are to the Texas Civil Practice and Remedies Code.

stated K.M.T. had epididymitis with no evidence of torsion. Based on his examination of K.M.T. and his review of Cohn's report, Franklin diagnosed K.M.T. with epididymitis, prescribed pain medication and antibiotics, and discharged him at approximately 3:45 a.m.

K.M.T. sought medical treatment for the same complaint over the next several days. He saw his pediatrician twice and also returned to the same emergency department. Each time, the diagnosis of epididymitis was confirmed, and K.M.T. was released. When the symptoms did not improve, K.M.T. returned to his pediatrician on April 9, 2003. The pediatrician ordered a new ultrasound. The radiologist who reviewed the new ultrasound noted a "left testicular tumor." Based on the results of this new ultrasound, K.M.T.'s pediatrician referred him to a urologist, Dr. William Strand.

Strand saw K.M.T. the same day. Strand's impression was that K.M.T. did not have a testicular tumor, but, instead, had testicular torsion. Strand performed left scrotal exploratory surgery that same day and found and removed a torsed, nonviable left testicle.

The Turners filed suit asserting health care liability claims against Franklin and Cohn. They alleged: (1) Cohn incorrectly interpreted the scrotal ultrasound as being consistent with epididymitis with no evidence of torsion; and (2) Franklin failed to consult a urologist and incorrectly diagnosed epididymitis instead of testicular torsion.

Franklin and Cohn moved for traditional summary judgment, *see* Tex.R. Civ. P.

166a(c), arguing the evidence proved as a matter of law that their conduct did not rise to the level of willful and wanton negligence, as required by section 74.153. Cohn also filed a no-evidence motion for summary judgment, *see* Tex.R. Civ. P. 166a(i), arguing the Turners could not present sufficient evidence to raise a genuine issue of fact that he acted with willful and wanton negligence.

In response, the Turners argued that section 74.153 did not apply because appellees did not render "emergency medical care" to K.M.T. as defined by the statute. They also argued that whether a physician was willfully and wantonly negligent is a matter that can only be determined by the jury and is never an appropriate issue for summary judgment. Further, they argued the summary judgment evidence did not disprove willful and wanton negligence as a matter of law and that they raised a genuine issue of material fact on the element of willful and wanton negligence.

The trial court granted appellees' motions and rendered final judgments in favor of each appellee.[3] The Turners appeal.

## STANDARDS OF REVIEW

We review a summary judgment de novo. *Mid–Century Ins. Co. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007). When we review a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grin-*

---

**3.** The Turners also alleged below that section 74.153 is unconstitutional. Appellees did not address this argument in their motions for summary judgment. The Turners, however, do not raise the constitutional issue on appeal. The trial court signed two orders, one for each defendant, both of which state, "This Judgment is final, disposes of all claims between Plaintiffs and [appellee], and is appealable." This is sufficient to constitute a final judgment for purposes of appeal. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 205–06 (Tex.2001).

*nell,* 951 S.W.2d 420, 425 (Tex.1997); *Smith v. Deneve,* 285 S.W.3d 904, 909 (Tex. App.-Dallas 2009, no pet.); *see also* TEX.R. CIV. P. 166a(c). We take evidence favorable to the non-movant as true, and we indulge every reasonable inference and resolve every doubt in favor of the non-movant. *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994).

When we review a no-evidence summary judgment, we inquire whether the non-movant adduced sufficient evidence to raise a genuine issue of fact on the challenged elements. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832 (Tex.App.-Dallas 2000, no pet.); *see also* TEX.R. CIV. P. 166a(i). All conflicts in the evidence are disregarded, and the evidence that tends to support the non-movant is accepted as true. *Connor v. Waltrip,* 791 S.W.2d 537, 539 (Tex.App.-Dallas 1990, no writ). A no-evidence motion for summary judgment should be denied if the evidence is sufficient for reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson,* 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). On the other hand, if the evidence is so weak as to create only a mere surmise or suspicion of a fact's existence, the evidence is in legal effect "no evidence," and summary judgment is proper. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Smith,* 285 S.W.3d at 909.

### DISCUSSION

### A. Does Section 74.153 Apply?

Section 74.153 governs health care liability claims for injuries or death arising from the provision of "emergency medical care" in a hospital emergency department, or in an obstetrical unit or surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department. It provides that, for such claims, the claimant

> may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care *only* if the claimant shows by a preponderance of the evidence that the physician or health care provider, *with wilful and wanton negligence,* deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.153 (emphasis added).

In their first issue, the Turners assert section 74.153 does not apply to their claims because appellees did not provide "emergency medical care." As stated in the Turners' brief: "Because Dr. Franklin diagnosed a non-emergency condition and treated [K.M.T.'s] condition in a non-emergent manner, Franklin cannot now take advantage of the protections in section 74.153 concerning the provision of emergency care which he did not provide."[4]

### 1. "Emergency Medical Care"

The statutory definition of "emergency medical care" as used in section 74.153

---

4. The Turners' brief goes on:

It would contravene public policy to allow a health care provider to not provide emergency care and at the same time be protected for providing emergency care. When a health care provider diagnoses a non-emergent condition and provides non-emergent treatment, the healthcare provider should be held to the same standard as other health care providers who provide non-emergent treatment. Thus, despite the fact that treatment was rendered in an emergency room, because Dr. Franklin and Dr. Cohn did not provide "emergency medical care" they cannot avail themselves of the heightened standard of proof contained in section 74.153.

comprises two elements: (1) the type of care provided (i.e., "bona fide emergency services"), and (2) the circumstances under which those services are provided. Specifically, the legislature defined "emergency medical care" as

> *bona fide emergency services* provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention *could reasonably be expected* to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. . . .

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(7) (Vernon 2005) (emphasis added).[5] Because the legislature provided more detail as to the second element of the definition, we will address that element first.

(a) Circumstances of providing services

Section 74.001(7) requires that the "bona fide emergency services" must be provided after the sudden onset of a medical or traumatic condition manifested with acute symptoms so severe that "the absence of immediate medical attention *could reason-*

*ably be expected* " to result in serious jeopardy to the patient's health, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. *See id.* (emphasis added). The section goes on to exclude "medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency." *Id.* Therefore, it is the severity of the patient's condition, its rapid or unforeseen origination, and the urgent need for immediate medical attention—including diagnosis, treatment, or both—in order to minimize the risk of serious and negative consequences to the patient's health that comprise the second element of the definition of "emergency medical care." The use of the phrase "could reasonably be expected," italicized above, also makes clear that whether the circumstances meet the second element of "emergency medical care" must be viewed prospectively and objectively, not retrospectively or subjectively.[6]

(b) "Bona fide emergency services"

■ Neither the phrase "bona fide emergency services" nor its constituent

---

**5.** This definition is similar to the definition of "emergency medical condition" in the federal Emergency Medical Treatment and Active Labor Act (EMTALA), codified at 42 U.S.C. § 1395dd(e)(1) (2006), and the definition of "emergency services" in section 311.021 of the Texas Health and Safety Code that specifies the responsibility of hospitals and physicians to provide emergency services without regard to a person's ability to pay for the services. *See* TEX. HEALTH & SAFETY CODE ANN. § 311.021 (Vernon 2010).

**6.** This "prospective" nature of the definition of emergency medical care is also compelled by the purpose of the statute. Section 74.153 expanded the former Good Samaritan statute to include physicians and health care providers treating patients in (or immediately after transfer from) hospital emergency depart-

ments. The legislature acted to encourage physicians and other health care providers to provide emergency medical care. *See* Michael S. Hull, et al., *House Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three*, 36 TEX. TECH L.REV. 169, 267–68 (2005) (the addition of section 74.153 was "made to recognize the unique challenges of providing emergency care and the liability risks associated with emergency care. . . ."). Limiting section 74.153 to only those situations where it is determined—after the fact—that a real emergency existed would frustrate the statute's purpose of providing—on a prospective basis—additional incentives to physicians and health care providers to treat patients in uncertain situations where a delay in treatment "could reasonably be expected" to result in serious, negative consequences.

parts is defined by the statute. However, because the phrase is a component of the statutory definition of "emergency medical care," the definition of "medical care" applicable to chapter 74 as a whole provides some guidance. That phrase is defined as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." Tex. Civ. Prac. & Rem.Code Ann. § 74.001(19). In turn, the occupations code defines "practicing medicine" as "the *diagnosis, treatment,* or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." Tex. Occ.Code Ann. § 151.002(13) (Vernon Supp.2009) (emphasis added). We consider the term "practicing medicine" to be narrower than both "medical care" and "bona fide emergency services"; however, we conclude the two latter terms both include the former, and that all three terms encompass diagnosis as well as treatment.

"Bona fide" is a Latin phrase meaning "in good faith." *See* Black's Law Dictionary 168 (7th ed. 1999). It is commonly used to convey that meaning,[7] although in some circumstances "bona fide" is used in such a way as to compel a secondary

meaning of "actual" or "real."[8] We find nothing to compel the conclusion that the legislature intended "bona fide" to convey the secondary definition. Moreover, we note that construing "bona fide" to mean "real or actual" would require "emergency medical care" to be determined retrospectively, in contradiction of the second element of the definition (discussed above), which requires a prospective determination.

Thus, we conclude "bona fide emergency services" means any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions. And if such services are provided during the time period and under the circumstances specified in section 74.001(7), they constitute "emergency medical care" within the meaning of section 74.153.

2. Analysis

■ The Turners argue that because appellees misdiagnosed K.M.T. with a non-emergency medical condition (epididymitis) and treated it accordingly (i.e., with antibiotics), their claims against appellees do not arise out of the provision of "emergency medical care." The essence of their argument is that section 74.153 applies only when a physician diagnoses a condi-

---

7. *See, e.g., Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994) (discussing exemption from compulsory school attendance laws for students taught in "bona fide home schools"); *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex.1983) (defining "bona fide purchaser" and "bona fide mortgagee" as requiring the purchaser or mortgagee to acquire its interest in the property in good faith, for value and without notice of the claim or interest of a third party, citing *Houston Oil Co. of Tex. v. Hayden,* 104 Tex. 175, 135 S.W. 1149 (1911)).

8. *See, e.g., Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979) (discussion of whether charge constituted interest or a "bona fide commitment fee"); *Ramo, Inc. v. English,* 500 S.W.2d 461, 465 (Tex.1973) (discussion of whether transaction constituted a "bona fide loan"); *see also* 29 U.S.C. § 213 (2006) (excepting from statutory minimum wage and maximum hour requirements employees "employed in a bona fide executive, administrative, or professional capacity....").

tion as an emergency and treats it accordingly. We reject this argument for several reasons.

First, the Turners' argument ignores the fact that "emergency medical care" includes both "diagnosis" as well as "treatment." As discussed above, the very act of diagnosing the patient under the circumstances and during the time period outlined in section 74.001(7) is itself included within the meaning of "emergency medical care." And that holds true regardless of whether the health care provider reached a diagnostic conclusion that the patient was suffering from a true emergency condition.

Second, the Turners' argument would restrict the additional protections afforded to health care providers by the statute to those instances in which they reached the diagnostic conclusion that the patient was suffering from a true emergency condition. This restriction would create an incentive for health care providers to assume the most dire of possibilities—and treat the patient accordingly—in order to be assured of the protections afforded by the statute. In contrast, the legislature did not define "emergency medical care" according to whether a particular diagnosis was made. Rather, it defined "emergency medical care" according to the type of services provided—including both diagnosis and treatment—and the circumstances under which those services were provided—i.e., after the sudden onset of a serious medical condition where failure to provide immediate medical attention could reasonably be expected to result in dire consequences to the patient.

Third, the Turners' argument necessarily entails a retrospective determination of whether a particular set of circumstances constitutes an emergency. This ignores the statutory language clearly calling for a prospective determination of that issue and undercuts the legislature's purpose in enacting the statute to provide physicians or health care providers a prospective incentive to provide emergency medical care in uncertain circumstances.

Because "medical care" includes the diagnosis of any disease or injury, we reject the contention that "bona fide emergency services" does not include the diagnosis of a non-emergency condition. As long as the diagnosis is made under the circumstances and within the time period provided, the diagnosis constitutes the provision of emergency medical care, regardless of the diagnostic determination made. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(7).

Here, K.M.T. went to the emergency department after experiencing "sudden" and "severe" pain. One of the possible diagnoses of his condition—testicular torsion—would, if correct, result in the loss of the testicle if not treated promptly. (In fact, it turned out K.M.T. was suffering from testicular torsion.) The Turners do not dispute that conducting an ultrasound examination constituted a good faith course of action under the circumstances. Indeed, the Turners assert appellees deviated from the standard of care—not by conducting the ultrasound examination—but by improperly interpreting its results.

Thus, Franklin's and Cohn's actions were in response to the sudden onset of acute and severe symptoms where the lack of immediate medical attention "could reasonably be expected" to result in serious consequences to K.M.T.'s health and physical condition. *See id.* We conclude that appellees' actions constitute "bona fide emergency services" within the meaning of section 74.001(7).[9] Thus, the Turners'

---

9. In doing so, however, we do not reach or address whether Franklin or Cohn were negli-

claims are for injuries arising out of the provision of emergency medical care within the meaning of section 74.001(7), and section 74.153 applies to their claims. We resolve the Turners' first issue against them.

## B. Can Willful and Wanton Negligence be Resolved by Summary Judgment?

In their second issue, the Turners argue the element of willful and wanton negligence is not appropriate for determination by summary judgment and should always be submitted to a jury. They also argue willful and wanton negligence, as used in section 74.153, is not the standard of *care*, but, instead, is the standard of *proof* required at trial. *See id.* § 74.153 (entitled "Standard of Proof in Cases Involving Emergency Medical Care").

### 1. Meaning of Willful and Wanton Negligence.

■ To resolve the Turners' argument, we must first assess the meaning of "wilful and wanton negligence." The statute does not define this phrase. The parties agree it is equivalent to gross negligence. How-

ever, the meaning of "wilful and wanton negligence" for purposes of section 74.153 is an issue of first impression in this Court.

The legislative history of House Bill 4 indicates the legislature did not intend to change the standard of liability for emergency care. During the senate hearings adopting the conference committee report on House Bill 4, one senator, in response to a question about the language in section 74.153, stated "No, the standard is the same. Both wilful and wanton negligence are covered, but this is basically a gross negligence standard. You don't have to prove intent." S.J. of Tex., 78th Leg., R.S. 5004 (2003). Further, courts addressing the former Good Samaritan statute, which is similar to section 74.153, have equated wilful and wanton negligence with gross negligence.[10] And Texas courts have also equated wilful and wanton conduct with gross negligence when interpreting similar language in other statutes.[11]

We conclude the legislature intended "wilful and wanton negligence," as used in section 74.153 of the civil practice and

gent in their treatment of K.M.T.

**10.** *See Hernandez v. Lukefahr*, 879 S.W.2d 137, 141 (Tex.App.-Houston [14th Dist.] 1994, no writ) (analyzing former Good Samaritan statute and concluding "it is obvious the legislature meant to exclude [from the protection of the statute] outrageous acts rising to the level of conscious indifference"); *see also Dunlap v. Young*, 187 S.W.3d 828, 836 (Tex. App.-Texarkana 2006, no pet.); *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 50 n. 25 (Tex.App.-Houston [1st Dist.] 1993, no writ) (citing *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 919–20 (Tex.1981)).

**11.** *See Burk Royalty*, 616 S.W.2d at 916–20 (equating willful negligence, conscious indifference to the welfare of others, and reckless disregard for the rights of others with gross negligence); *Chrismon v. Brown*, 246 S.W.3d 102, 106–07 (Tex.App.-Houston [14th Dist.]

2007, no pet.) (equating "wilfully negligent, or done with conscious indifference or reckless disregard for the safety of others" exception to immunity defense under civil practice and remedies code section 84.007(a) with gross negligence); *Moncada v. Brown*, 202 S.W.3d 794, 799–800 (Tex.App.-San Antonio 2006, no pet.) (equating willful and wanton conduct under government code section 497.096 with gross negligence); *Warren v. Medley*, 521 S.W.2d 137, 139 (Tex.Civ.App.-Beaumont 1975, no writ) (duty owed to licensee by owner of property not to injure him by "willful, wanton or gross negligence").

*See also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 2 cmt. a, b (2010) (noting terms such as gross negligence, willful or wanton misconduct, and reckless disregard for risk have been used to convey the idea of aggravated wrongdoing that still falls short of intentional torts and equating such terms with recklessness).

remedies code, to mean "gross negligence."[12]

 Gross negligence, in turn, is comprised of two elements-one objective and one subjective.[13] Circumstantial evidence is sufficient to prove either element of gross negligence. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 22–23 (Tex.1994).

 First, viewed objectively from the actor's standpoint, the act or omission must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others, considering the probability and magnitude of the potential harm to others. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 248 (Tex.2008); *Moriel,* 879 S.W.2d at 23. Under the objective element, the defendant's conduct must cre-

ate "an extreme degree of risk," which is a "threshold significantly higher than the objective 'reasonable person' test for negligence." *Moriel,* 879 S.W.2d at 22 (quoting *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993)); *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998). Extreme risk is more than a remote possibility of injury or even a high probability of slight injury; the defendant's conduct must involve "the likelihood of serious injury" to the plaintiff. *Moriel,* 879 S.W.2d at 22 (quoting *Alexander,* 868 S.W.2d at 327).

 To meet the subjective element, the actor must "have actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others." *Hogue,* 271 S.W.3d at 248;[14] *see also Moriel,*

12. We note one of our sister courts declined to equate "wilful and wanton negligence" with gross negligence in the context of a health care liability case. *See Benish v. Grottie,* 281 S.W.3d 184, 192 (Tex.App.-Fort Worth 2009, pet. denied) (noting differences in interpretations, declining to equate willful and wanton negligence with gross negligence, and declining to define term). However, *Benish* involved the sufficiency of an expert report, not the standard of proof or care required at trial by section 74.153. *Id.* Here we are confronted by that latter issue, as a hearing on a motion of summary judgment constitutes a trial, *Goswami v. Metro. Sav. & Loan Ass'n,* 751 S.W.2d 487, 490 (Tex.1988); *McIntyre v. Wilson,* 50 S.W.3d 674, 684 (Tex.App.-Dallas 2001, pet. denied), and defining the phrase "willful and wanton negligence" is a necessary prerequisite to determining whether summary judgment-on either traditional or no-evidence grounds-based on that issue was proper.

13. *See, e.g.,* the definition of "gross negligence" contained in chapter 41 of the civil practice and remedies code relating to damages:

(11) "Gross negligence" means an act or omission:
(A) which when viewed objectively from the standpoint of the actor at the time of

its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11) (Vernon 2008).

14. In *Hogue,* the supreme court concluded evidence the hospital knew that the ability to perform "stat" echo-cardiograms (meaning immediate or as soon as possible) was necessary for its emergency department, but elected not to obtain echo-cardiogram capability on a stat basis even after being advised to do so, along with other evidence, was legally sufficient under a clear and convincing evidence standard to support the jury's conclusion that the hospital "acted with conscious indifference to an extreme risk of serious injury when it (1) elected to outsource echo services without a guaranteed response time while providing emergency services, (2) failed to communicate this limitation to its medical staff so they could consider other options to treat critical care patients, and (3) delayed obtaining the echo in spite of the serious risk to [plaintiff's] health." *Hogue,* 271 S.W.3d at 253.

879 S.W.2d at 23; *Ellender,* 968 S.W.2d at 921. "The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare, and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Burk Royalty,* 616 S.W.2d at 922; *accord Ellender,* 968 S.W.2d at 921.

### 2. Deciding Willful and Wanton (i.e., Gross) Negligence by Summary Judgment

■ Having concluded the "wilful and wanton negligence" standard under section 74.153 is equivalent to a gross negligence standard, we consider the Turners' argument that the standard can never be decided by summary judgment.

The Turners have not cited authority expressly holding that willful and wanton negligence or gross negligence must always be decided by a jury or trier of fact. Several cases have reversed summary judgments where the defendant argued he had disproved gross negligence or willful and wanton negligence as a matter of law.[15] In other cases, the trial court's summary judgment determination of that issue was upheld.[16]

Because willful and wanton negligence (i.e., gross negligence) has a subjective element inquiring into the defendant's state of mind,[17] and because issues of intent are usually best left to the trier of fact to resolve based on all the evidence and surrounding circumstances,[18] determining

---

**15.** For example, in *Wheeler,* the defendant emergency medical technicians (EMTs) obtained summary judgment based on an affirmative defense under the former Good Samaritan statute, which limited their liability for emergency care to acts that were willfully or wantonly negligent. *Wheeler,* 866 S.W.2d at 50. The appellate court concluded there were internal contradictions in the deposition testimony and that the EMTs' expert failed to address whether some of the conduct was grossly negligent and appeared to contradict the testimony of the EMTs. *Id.* Thus, the appellate court reversed, holding that the EMTs failed to establish as a matter of law they were not willfully or wantonly negligent. *Id.* at 51.

**16.** For example, *Dunlap* affirmed a summary judgment for the defendant EMTs because the summary judgment evidence conclusively established they were not "willfully or wantonly negligent" under the former Good Samaritan law. *Dunlap,* 187 S.W.3d at 837 (concluding summary judgment evidence, including expert's concession that whether to intubate patient during transport to hospital was a "judgment call," supported summary judgment for defendant EMTs); *see also Hernandez,* 879 S.W.2d at 142 (concluding doctor established elements of Good Samaritan statute as a matter of law including negating that he was willfully or wantonly negligent). Summary judgments have also been affirmed in other cases under a willful or wan-

ton negligence or gross negligence standard. *See Moncada,* 202 S.W.3d at 802–03 (summary judgment evidence conclusively established affirmative defense of immunity from liability under government code section 497.096 and that defendant was not "intentionally, wilfully, or wantonly negligent"); *Warren,* 521 S.W.2d at 139 (premises owner successfully discharged "onerous burden of showing that he was not guilty of any willful or wanton conduct or gross negligence" when his guest was injured after another guest placed her on top of a glass table, which broke).

**17.** *See Moriel,* 879 S.W.2d at 23. Because direct evidence of a party's state of mind is rarely available, this element may be proved by circumstantial evidence. *Id.* ("We hereby reaffirm our holding that the defendant's subjective mental state can be proven by direct or circumstantial evidence.").

**18.** "Issues of intent, knowledge[,] and state of mind are not susceptible to being readily controverted and are best left to the determination of the trier of fact." *Lawrence v. TD Indus.,* 730 S.W.2d 843, 845 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) (affidavits of defendant's employees stating they were not consciously indifferent to the rights of the deceased were not readily controvertible and did not support summary judgment for defendant on plaintiff's gross negligence claim).

that issue by summary judgment usually will be inappropriate.[19] However, we conclude there is nothing about the willful and wanton negligence standard in section 74.153 that categorically precludes it from resolution by summary judgment. As with any other issue, whether summary judgment is proper must be determined by reviewing the summary judgment evidence in each case under the established, applicable standards. TEX.R. CIV. P. 166a.

We resolve the Turners' second issue against them.

## C. Was Summary Judgment Appropriate Here?

In their third issue, the Turners argue Franklin did not conclusively disprove that he acted with willful and wanton negligence. They also argue that they raised genuine issues of material fact regarding whether Franklin and Cohn acted with willful and wanton negligence.

### 1. As to Franklin

▮▮▮ Because Franklin moved for summary judgment only on traditional

grounds, it was his burden to conclusively disprove the subjective element required to prove gross negligence. *See Grinnell*, 951 S.W.2d at 425; *Deneve*, 285 S.W.3d at 909. In other words, he had to negate as a matter of law that he had "actual, subjective awareness of the risk involved and [chose] to proceed in conscious indifference to the rights, safety, or welfare of others." *Hogue*, 271 S.W.3d at 248; *see also Lee Lewis Constr. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001); *Burk Royalty*, 616 S.W.2d at 922. We take the evidence favorable to the Turners, the non-movants, as true and indulge every reasonable inference and resolve every doubt in their favor. *Trapnell*, 890 S.W.2d at 800.

Franklin relies on the deposition testimony of the Turners' expert, Dr. Craig Kennedy, who testified that although he believed that Franklin made the wrong "call" and that his actions constituted negligence, he did not believe Franklin tried to harm K.M.T. or that Franklin's actions constituted a "complete want of care" for K.M.T.[20] Franklin argues this evidence ne-

19. *See Hunsucker v. Omega Indus.*, 659 S.W.2d 692, 698 (Tex.App.-Dallas 1983, no writ) ("We conclude that issues such as reasonableness and foreseeability are inherently issues for a jury because whether each is precluded as a matter of law depends upon all the facts and circumstances in each case.... Because of variations of the circumstances which may be shown at a trial on the merits, summary judgment is rarely justified in such cases.").

20. Kennedy's deposition testimony is as follows:

Q. Do you think that Dr. Franklin tried to harm this patient?
A. No.
Q. Do you think that he felt he was ordering the wrong test for this patient?—
A. No.
Q. Do you think that he felt his actions were going to cause harm to the patient—
A. No.
Q. —and he decided to do it anyway?

A. No.
Q. Do you think he made a judgment call in this case and you just feel that judgment call was in error? Would that be fair?
A. Well—
Q. To my client?
A. I think every decision we make regarding our patients can be called a judgment call. Every treatment, diagnostic, and disposition decision we make is—involves clinical judgment. I know the term "judgment" may have some legal connotation that I'm not aware of. But yes, he made a judgment. He made judgments about his patient, like we all do in the clinical context, and I believe the judgments he made were negligent or we wouldn't be here today. So a judgment call—I think the most common usage of that is in sports parlance, and I don't know if that applies in this case. It depends what you mean by "judgment call."

. . . .

gated the element of intent as a matter of law and thus summary judgment in his favor was justified. The Turners respond that intent to harm is not required to prove a defendant acted with willful and wanton negligence, and thus the testimony cited to support Franklin's position that the conduct was not intentional is irrelevant. We agree with the Turners.

Evidence of "some care" will not disprove gross negligence as a matter of law. *See Ellender,* 968 S.W.2d at 923–24 (evidence of "some care" will not insulate defendant from gross negligence liability); *Frias v. Atl. Richfield Co.,* 999 S.W.2d 97, 105–06 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (evidence of precautions taken by employer to protect employees from exposure to benzene did not conclusively negate subjective element of gross negligence). Courts must look for "evidence of the defendant's subjective mental state rather than the defendant's exercise of care." *Moriel,* 879 S.W.2d at 20. Gross negligence does not require proof the defendant intended or tried to harm the plaintiff; it requires proof the defendant was subjectively aware of the risk involved and chose to proceed in conscious indifference of the rights, welfare, and safety of others. *Hogue,* 271 S.W.3d at 248.

> Q. Do you believe that Dr. Franklin's action in this case involved a complete want of care—that is, he treated this patient as if he didn't care for him whatsoever?
> A. No.
> Q. It certainly appears that he did care for the patient and he did try to come to a diagnosis, he made a diagnosis and he gave appropriate treatment for that diagnosis, although you believe it was the wrong one; true?
> A. Correct.

21. *See Dunlap,* 187 S.W.3d at 837; *Hernandez,* 879 S.W.2d at 142 (evidence established lack of wanton negligence).

The quoted testimony indicates Kennedy believed Franklin tried to care for K.M.T. and did not intend to harm him. It does not, however, address Franklin's subjective awareness of a risk or whether he acted with conscious indifference to the rights, safety, or welfare of others. This evidence is insufficient to disprove gross negligence, i.e., willful and wanton negligence, on Franklin's part as a matter of law.

Nor do we believe that classifying a defendant's acts or omissions as a "judgment call" conclusively negates the subjective element of gross negligence. The subjective awareness and conscious indifference necessary for a finding of gross negligence will almost always require evidence of "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts." *City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex.2005) (quoting *Burk Royalty,* 616 S.W.2d at 922); *Moriel,* 879 S.W.2d at 23 (defendant's subjective mental state may be proven by direct or circumstantial evidence). While we recognize that such subjective elements may sometimes be resolved on summary judgment,[21] on this summary judgment record, Franklin did not disprove the subjective element of gross negligence as a matter of law.[22]

22. *See Frias,* 999 S.W.2d at 105–06; *Wheeler,* 866 S.W.2d at 50 (concluding internal contradictions in defendants' deposition testimony and expert's affidavit that failed to address whether conduct was gross negligence and contradicted some testimony of defendants precluded summary judgment for defendants under Good Samaritan statute); *Lawrence,* 730 S.W.2d at 845 (concluding defendants' affidavits that they were not consciously indifferent to the rights, welfare, and safety of plaintiff did not conclusively negate subjective element of gross negligence).

Viewing the summary judgment evidence in favor of the Turners, we conclude Franklin failed to meet his burden to prove as a matter of law that he did not, with subjective awareness of the risk involved, choose to proceed in conscious indifference to the rights, safety, or welfare of K.M.T. Accordingly, we sustain the Turners' third issue as to Franklin.

### 2. As to Cohn

■ The Turners alleged Cohn misinterpreted K.M.T.'s ultrasound images and wrongly concluded K.M.T. had epididymitis with no evidence of torsion. Cohn filed a combined no-evidence and traditional summary judgment motion asserting that the Turners had no evidence, or could not raise a fact issue about whether, he acted with willful and wanton negligence in reviewing K.M.T.'s ultrasound. We consider Cohn's no-evidence motion first. *See Kalyanaram v. Univ. of Tex. Sys.*, 230 S.W.3d 921, 925 (Tex.App.-Dallas 2007, pet. denied). In response to that motion, the burden was on the Turners as nonmovants to present sufficient evidence to raise a genuine issue of fact on the challenged element. *Gen. Mills Rests.*, 12 S.W.3d at 832.

To meet that burden, the Turners relied on a report from their expert radiologist, Dr. E. Richard Graviss, who opined Cohn was negligent in concluding the ultrasound showed K.M.T. had normal testicular flow in the left testicle.[23] The Turners contend Graviss's report raised a fact issue about whether Cohn breached the negligence standard of care, and they renew their earlier argument that whether that breach was with willful and wanton negligence "is uniquely an issue for the jury to determine." We have already rejected this latter argument.

While Graviss's report may well have raised a fact issue as to Cohn's negligence, it does not raise a fact issue about whether Cohn's alleged error in judgment was *more* than mere negligence. *See Wheeler,* 866 S.W.2d at 50–51 (discussing summary judgment evidence that raised fact issue about whether conduct was willfully and wantonly negligent). Specifically, it did not address whether Cohn was subjectively aware of an extreme risk or acted with conscious indifference to the rights, safety,

---

**23.** Graviss's affidavit stated, in relevant part:

Doppler interrogation of the left testicle revealed low velocity blood flow without a demonstrable arterial pulse. Black and white images did not show the color, however it can be recognized. Neither testicle exhibited the amount of blood flow that I expect in patients of [K.M.T.]'s age. The spectral waveforms in the right testicle exhibited a distinct arterial peak. The absolute exclusion of torsion is by demonstrating an arterial waveform. The Doppler waveform of the left testis revealed only low velocity flow without arterial peaks.

The scrotal sonogram report from 04/03/03 is accurate except for the second sentence in the findings *"there is normal testicular flow identified."* The waveform pattern in [K.M.T.]'s left testicle does not exclude the possibility of torsion. (Arterial peaks are absent.)

I am familiar with the standard of care utilized by radiologists in evaluating sonograms of the testes to diagnose testicular torsion and/or epididymitis, and the standard of care for treating testicular torsion. That standard requires the presence of arterial blood flow (an arterial peak). In my opinion, Dr. Cohn failed to meet or provide the standard of care when he evaluated the sonogram of [K.M.T.] by concluding *"there is normal testicular flow identified"* when in fact the sonogram failed to show arterial blood flow in the left testicle. A report of no arterial flow in the left testis should have caused early intervention with the expected preservation of left testicular viability. The testis will die if not detorsed promptly. (Six hours is an acceptable standard.)

Graviss also noted he did not review certain information about the ultrasound and that he "could reach a different opinion" if he had access to additional information.

or welfare of others. *See Hogue*, 271 S.W.3d at 248. And the Turners do not cite to any other direct or circumstantial evidence in the record raising a genuine issue of fact on the subjective element of willful and wanton negligence.

Because Graviss's report does not raise a genuine issue of material fact concerning the element of willful and wanton negligence, the no-evidence summary judgment in favor of Cohn was proper. Accordingly, we do not need to consider the issues the Turners raised in response to Cohn's traditional motion for summary judgment.

We resolve the Turners' third issue against them as to Cohn.

### Conclusion

We affirm the trial court's summary judgment in favor of Cohn. We reverse the trial court's summary judgment in favor of Franklin and remand that portion of the case for further proceedings.