# Supreme Court of Texas

### No. 22-0835

Kristy Marsillo, D.O.,

*Petitioner*,

v.

Robin Dunnick, Individually, and as Next Friend to
Raynee Dunnick, and Dana Dunnick,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued October 5, 2023**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

By statute, a physician is not liable for injury to a patient "arising out of the provision of emergency medical care in a hospital emergency department" without proof that the physician acted "with willful and wanton negligence".[1] The courts that have considered that standard of proof have concluded that it is tantamount to gross negligence. We agree that the standard is at least gross negligence, and because the evidence

---

[1] TEX. CIV. PRAC. & REM. CODE § 74.153(a).

in this case falls short, we leave for another day whether a showing of willful and wanton negligence requires more. We reverse the court of appeals' judgment[2] and reinstate the trial court's summary judgment for the physician.

**I**

Thirteen-year-old Raynee Dunnick was bitten by a rattlesnake on her left foot around 8:20 p.m. while walking her dog in her front yard. She arrived at Seton Medical Center Hays by EMS at 9:14 p.m., where she was triaged by the nursing staff. At 9:20 p.m., Raynee was seen by attending physician Dr. Kristy Marsillo, who immediately implemented the hospital's Snakebite Treatment Guidelines.

The Guidelines are taken from recommendations of the American Academy of Family Practice and of the manufacturer of the antivenom used by the Seton family of hospitals, brand name CroFab, to treat envenomation from the bite of a North American pit viper. According to its manufacturer, CroFab "was shown in clinical studies to be effective when given within 6 hours of snakebite", but importantly, giving the antivenom is not a risk-free proposition. For one thing, CroFab usually is contraindicated for patients with a known history of hypersensitivity to certain substances. For another, 19 of 42 clinical-trial patients "experienced an adverse reaction", and three of those patients experienced a reaction that was "severe or serious". The "[m]ost common adverse reactions . . . were urticaria, rash[,] nausea, pruritus[,] and back pain." Yet another potential complication of treatment is "recurrent

---

[2] 654 S.W.3d 224 (Tex. App.—Austin 2022).

coagulopathy"—impairment in the blood's ability to clot. CroFab should be administered when called for and not otherwise.

The Guidelines lay out a detailed, seven-part process for hospital staff to follow when a patient presents with a snakebite. Part 1 is the initial assessment, including the patient's vital signs and the type of snake, if known. Part 2 lists the initial lab work to be ordered and the panels to be repeated two hours later. Part 3 directs insertion of an IV and, potentially, a tetanus shot.

Part 4, labeled the CroFab Decision Tree, sets out the process the treating physician should follow to determine whether and when to administer antivenom. That process revolves around the patient's "snakebite severity score". The Guidelines list potential symptoms under six physical systems—pulmonary, cardiovascular, local wound, gastrointestinal, hematologic, and central nervous. The physician is to give each symptom a value between 0 and 4, depending on severity. For example, under the central nervous system, "[n]o symptoms/signs" is a score of 0, and "[s]evere confusion, lethargy, seizures, coma, psychosis, or generalized fasciculation" is a score of 3. The severity score is calculated by circling the symptoms present under each grouping and adding up the values assigned to them. The CroFab decision tree directs that if the patient has a severity score of 3 or less and her coagulation lab work is normal, then no antivenom is to be given, but the patient should be re-examined and the severity score recalculated every 30 minutes for eight hours. If the severity score is ever 4 or more or her coagulation lab work is abnormal, then the patient is immediately given the antivenom.

3

Part 5 explains how CroFab should be dosed. Part 6 lists adjunctive treatments to be considered and some, like NSAIDs, that should not be given. Part 7 explains the follow-up process once the patient is released.

On initial assessment, Raynee's snakebite severity score was just 2, for bruising and swelling on her foot "involving less than half the extremity [7.5-50 cm from bite site]". Her coagulation lab work was normal at that time. At 9:45 p.m., the swelling had increased up her leg 13 cm from the bite, her foot was discolored, and she had "[b]lood seeping from two puncture wounds." At 10:15 p.m., the swelling had progressed to 20 cm from the bite site. Still, her severity score remained 2 because the swelling was less than 50 cm from the bite site and she was not then experiencing any other symptoms that would increase the score. Raynee was given a second dose of morphine for pain.

At 11:20 p.m., Raynee reported burning pain in her toe to a nurse, who relayed the information to Marsillo. Marsillo added another point for paresthesia—an abnormal skin sensation—increasing Raynee's severity score to 3. At the same time, she ordered that Raynee's coagulation studies be repeated on a stat basis. The labs were returned at 11:39 p.m. and showed a drop in platelets and fibrinogen. Those changes increased Raynee's severity score to 5.

Eleven minutes later, at 11:50 p.m., Marsillo ordered that six vials of antivenom be prepared. The Guidelines direct that each vial be reconstituted with 10 ml of sterile water and then that all vials be diluted with 250 ml of saline solution prior to administration. Hospital staff began infusing Raynee with CroFab at 12:29 a.m., just over four

hours after she was bitten.

Because Seton Hays does not admit children overnight, Marsillo arranged for Raynee's transfer to Dell Children's Medical Center "with crofab running." She was admitted at 1:35 a.m., when Dell initiated its own "envenomation protocol". Three hours after being admitted, Dell infused Raynee with another six vials of CroFab. Later that morning, improvement in Raynee's lab work and symptoms resulted in her being put on a maintenance dose of only two vials.

Twelve hours after the maintenance dose was initiated, Raynee's lab work remained normal and the swelling in her foot had decreased. Twenty-four hours after being admitted to Dell, Raynee received her last dose of CroFab. At that point, her "[l]abs [were] much improved" and her "[s]ymptoms [had] ceased progression and improved." She was discharged on crutches the next afternoon after a physical therapy evaluation. Dell's discharge notes state that "Raynee's hospital course was uncomplicated."

Raynee and her parents sued Marsillo for negligence, alleging that her failure to depart from the Guidelines and administer CroFab immediately upon Raynee's arrival at Seton Hays was negligence resulting in Raynee's pain, suffering, impairment, and disfigurement. They seek over $1,000,000 in damages. The trial court granted Marsillo's no-evidence summary judgment on breach of duty and causation. The court of appeals reversed.[3] We granted Marsillo's petition for review.

---

[3] *Id.*

We consider first what standard of proof is required for Raynee's claim, then whether she has met that standard.

## II

Section 74.153(a) of the Civil Practice and Remedies Code imposes a heightened burden of proof on Raynee's negligence claim. With exceptions not applicable here, the statute provides that

> in a suit involving a health care liability claim against a physician . . . for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department, . . . the claimant bringing the suit may prove that the treatment or lack of treatment by the physician . . . departed from accepted standards of medical care . . . only if the claimant shows by a preponderance of the evidence that the physician . . . , *with willful and wanton negligence,* deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician . . . in the same or similar circumstances.[4]

The Legislature has not defined *willful* and *wanton. Black's Law Dictionary* defines *willful* as "[v]oluntary and intentional",[5] and *wanton* as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences."[6] For *wanton, Black's* cites one source characterizing the term as "reckless plus".[7] In differing contexts, the Legislature has used a form of the words *willful* and *wanton* together in some 70 statutes. In slightly fewer than half, it has coupled the words

---

[4] TEX. CIV. PRAC. & REM. CODE § 74.153(a) (emphasis added).

[5] *Willful,* BLACK'S LAW DICTIONARY (11th ed. 2019).

[6] *Wanton,* BLACK'S, *supra* note 5.

[7] *Id.* (quoting ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 879-880 (3d ed. 1982)).

with a form of the word *negligent*. For example, the statute commonly referred to as the good samaritan law shields a bystander who "in good faith administers emergency care" from "civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent".[8] In a quite different context, a statute shields a county tax assessor–collector from liability for the failure to comply with requirements for registering a vehicle previously registered out of state "unless the failure constitutes wilful or wanton negligence."[9] But neither term pairs smoothly with *negligence*—the "failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation"[10]—and in more than half of the statutes that use *willful* and *wanton* together, they are joined with some form of the word *intentional*. For example, civil liability for handling hazardous materials

---

[8] TEX. CIV. PRAC. & REM. CODE § 74.151(a). The good samaritan law predates Section 74.153 and uses an older spelling, *wilful*. Section 74.153 was enacted as part of the 2003 tort-reform measures in House Bill 4 and contains the more modern spelling, *willful*. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 871-872. House Bill 4 moved the good samaritan law from Section 74.001 to Section 74.151 but retained the original spelling in that section. *See* Act of June 2, 2003, *supra*, 2003 Tex. Gen. Laws 847, 871 (codifying TEX. CIV. PRAC. & REM. CODE § 74.151 as amended); *see also Hernandez v. Lukefahr*, 879 S.W.2d 137, 140 (Tex. App.—Houston [14th Dist.] 1994, no writ) (quoting former TEX. CIV. PRAC. & REM. CODE § 74.001, now in § 74.151). Texas statutes and caselaw use both the spellings. We use *wilful* when quoting an authority containing that spelling and *willful* otherwise.

[9] TEX. TRANSP. CODE § 501.030(f); *see also* TEX. CIV. PRAC. & REM. CODE § 91A.003 (shielding volunteer audiologists and speech-language pathologists from liability unless an act or omission is "intentional, wilfully or wantonly negligent, or done with conscious indifference or reckless disregard for the safety of others").

[10] *Negligence*, BLACK'S, *supra* note 5.

is limited in some situations, "[e]xcept in a case of reckless conduct or intentional, wilful, or wanton misconduct".[11] In some statutes, *willful*, *wanton*, *negligent*, and *intentional* are all used to describe a standard of conduct.[12]

In *Turner v. Franklin*, the court of appeals "conclude[d] [that] the legislature intended 'wilful and wanton negligence,' as used in section 74.153 . . . , to mean 'gross negligence.'"[13] The court relied on an oral statement by one legislator at a legislative hearing on the bill codifying Section 74.153[14] and caselaw interpreting statutes with similar phrasing.[15] *Turner* has been followed by several courts of appeals, including the court below.[16] And *Black's* notes that gross negligence has

---

[11] TEX. CIV. PRAC. & REM. CODE § 79.002(a).

[12] *See, e.g.*, TEX. GOV'T CODE § 414.013(a)(1) (providing that a person who submits a crime stoppers tip is immune from civil liability arising from the submission unless the submission was "intentionally, wilfully, or wantonly negligent or false").

[13] 325 S.W.3d 771, 780-781 (Tex. App.—Dallas 2010, pet. denied).

[14] We have cautioned that "the statement of a single legislator, even the author and sponsor of the legislation, does not determine legislative intent." *AT & T Commc'ns of Tex., L.P. v. Sw. Bell Tel. Co.*, 186 S.W.3d 517, 528-529 (Tex. 2006). "We are obliged to effectuate the intent of the Legislature and not merely that of some of its members. It is not unusual for intentions concerning particular legislation to vary among its supporters." *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 328 (Tex. 1994) (Hecht, J., concurring and dissenting). For that reason, "[w]e must assume that the Legislature has done its very best to express its intent in the words of the statute itself." *Id.*

[15] *See Turner*, 325 S.W.3d at 780 & nn. 10-11.

[16] *See* 654 S.W.3d at 229 ("[W]e join those courts of appeals that have followed *Turner* and conclude that the legislature intended the phrase 'wilful and wanton negligence,' as used in Section 74.153, to mean 'gross negligence.'" (collecting cases)).

8

also been called "reckless negligence[,] wanton negligence[,] willful negligence[,] willful and wanton negligence[,] [and] willful and wanton misconduct".[17]

The standard for gross negligence is well established. It has both an objective and a subjective component. The standard requires an act or omission

    (A)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    (B)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[18]

"Under the first, objective element, an extreme risk is 'not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.'"[19] "Under the [second,] subjective element, 'actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care.'"[20]

*Willful* and *wanton*, given their plain, ordinary meaning, suggest, at least, that the actor is not only consciously indifferent to the

---

[17] *Gross negligence*, BLACK'S, *supra* note 5.

[18] TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see, e.g.*, *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (citing § 41.001(11)).

[19] *Boerjan*, 436 S.W.3d at 311 (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).

[20] *Id.* (quoting *Mobil Oil Corp.*, 968 S.W.2d at 921).

likelihood that his conduct will cause serious injury but is willing that it do so, even if not quite intending to inflict harm (as distinct from intending to act as he does). That could make willful and wanton negligence a yet higher standard than gross negligence. Marsillo argues that willful and wanton negligence is at least gross negligence, if not a higher standard. Raynee assumes that willful and wanton negligence is gross negligence and does not argue for a lower standard. We agree with the parties that willful and wanton negligence is at least gross negligence, and if the evidence before us falls short of showing that Marsillo was grossly negligent, we need not consider whether and how a willful and wanton standard is higher.[21] Accordingly, we turn to the evidence and leave to a future case the task of stating the standard's precise contours.[22]

---

[21] At least one other state supreme court has concluded that willful and wanton negligence is a higher standard. Decisions of the Supreme Court of Virginia have "recognized . . . three levels of negligence", with the first two being simple and gross negligence. *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004).

> The third level of negligent conduct is willful and wanton negligence. This conduct is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another."

*Id.* at 918-919 (quoting *Etherton v. Doe*, 597 S.E.2d 87, 90 (Va. 2004)). It is the actor's "aware[ness] . . . that his conduct probably would cause injury" that in Virginia distinguishes willful and wanton negligence from gross negligence, which merely requires "indifference" or "complete neglect" of others' safety. *Id.*

[22] The Legislature has sometimes used gross negligence and *willful* or *wanton* together in the same statutory section, but these references are not clarifying. For example, a limitation of liability for space-flight entities for

10

Marsillo filed a hybrid motion for summary judgment on the elements of breach of duty and causation.[23] We start with the no-evidence motion on breach of duty. The trial court "must" grant a no-evidence motion "unless the respondent produces summary judgment evidence raising a genuine issue of material fact."[24] Raynee was therefore required to present legally sufficient evidence that (1) Marsillo's decision to follow the Guidelines—rather than depart from them and administer antivenom immediately—objectively posed "an extreme degree of risk" to Raynee; and (2) Marsillo was subjectively aware of this risk but "proceed[ed] with conscious indifference" to Raynee's safety.[25] Raynee's only evidence on breach is the affidavit of her expert, Dr. Benjamin Abo. Abo is a highly credentialed toxinologist who specializes in snake envenomation; he also practices emergency medicine in Florida.[26]

---

injury arising from space-flight activity does not apply to an injury "proximately caused by the space flight entity's gross negligence evidencing wilful or wanton disregard for the safety of the space flight participant". TEX. CIV. PRAC. & REM. CODE § 100A.002(b)(1). A limitation of liability for sports officials for injury or property damage occurring in an athletic competition does not apply if the official's act or omission constitutes "(1) gross negligence; or (2) wanton, wilful, or intentional misconduct." *Id.* § 94.002(a).

[23] "Motions for traditional summary judgment under Rules 166a(a) or (b) may be combined with Rule 166a(i) no-evidence motions in 'hybrid' motions for summary judgment." *Mitchell v. MAP Res., Inc.*, 649 S.W.3d 180, 187 n.6 (Tex. 2022) (citing *Binur v. Jacobo*, 135 S.W.3d 646, 650-651 (Tex. 2004)).

[24] TEX. R. CIV. P. 166a(i).

[25] TEX. CIV. PRAC. & REM. CODE § 41.001(11).

[26] At the summary judgment hearing, Raynee's counsel described Abo

Abo's affidavit states that "[s]nake envenomation is a time-sensitive emergency"; that "[t]he only cure for envenomation is antivenom"; and that "[o]utcomes are best when definitive management occurs as soon as possible, especially with rattlesnakes." He says that "[i]mmediate administration of antivenom was necessary for Raynee once she exhibited signs of envenomation", and he opines that Marsillo "acted consciously indifferent in not ordering antivenom" immediately upon Raynee's arrival. "When viewed objectively," he says, "a reasonable and prudent board certified emergency medicine physician would believe that Dr. Marsillo's failure to immediately administer antivenom upon admission would create an extreme degree of risk of harm to Raynee in not being able to prevent the progression of venom in her system." Further, "[a] reasonable ER physician would eliminate the extreme risk of harm that venom causes the body by immediately administering antivenom to Raynee upon her admission."

But Abo's affidavit does not explain how he arrived at the opinion that the standard of care is always to administer antivenom immediately upon the first sign of envenomation or why the risks of

---

as "a world-renown, award winning, TV show King[s] of Pain star". Kings of Pain, which airs on the History Channel, features a wildlife biologist and an animal handler who "attempt to get stung and bitten by animals and insects from different parts of the world, in order to measure the amount of pain they each receive from each bite or sting." *Kings of Pain*, WIKIPEDIA (last visited Dec. 30, 2023). Abo appeared in six episodes between 2019 and 2022. *Kings of Pain*, IMDB, https://www.imdb.com/title/tt11091524/ (last visited Dec. 30, 2023). His role was to accompany the hosts in the field and "make sure that the extremely painful bites don't turn deadly." *Kings of Pain*, HISTORY, https://www.history.com/shows/kings-of-pain/cast/dr-ben-abo (last visited Dec. 30, 2023).

antivenom administration should not be considered, as required by the Guidelines. The affidavit references a "unified treatment algorithm for the management of crotaline snakebite in the United States, which is an evidence-informed consensus that also is what all FDA approved antivenom algorithms are based on." But the affidavit never explains what the unified treatment algorithm is, why an algorithm is necessary if the standard of care is as straightforward as the affidavit says it is, or whether the unified algorithm he references differs from the Guidelines adopted by Seton. In fact, the affidavit does not even acknowledge the Guidelines or that Marsillo followed them when treating Raynee, even though the affidavit affirms that Abo reviewed Raynee's medical records. Because the affidavit fails to address the Guidelines, it also does not explain how Marsillo's following them in this case objectively posed an extreme degree of risk to Raynee instead of avoiding the competing danger of side effects from antivenom administration. The affidavit's repeated assertions that Marsillo "acted consciously indifferent" to Raynee are based solely on her failure to ignore the Guidelines and order antivenom immediately and on no other facts.

The court of appeals concluded that Abo's affidavit creates a genuine issue of material fact on the objective prong of gross negligence.[27] We disagree. Abo's affidavit consists solely of conclusory assertions, which are "considered no evidence."[28] Just last Term we

---

[27] *See* 654 S.W.3d at 232-233.

[28] *Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 585 (Tex. 2023) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 222 (Tex. 2019)).

13

reiterated that

> [a]n expert's testimony is conclusory when the expert asserts a conclusion with no basis, when the basis offered provides no support for the opinion, or when the expert offers only his word that the bases offered to support his opinion actually exist or support his opinion. An expert must link his conclusions to the facts and explain the basis of his assertions. Asking the jury to take the expert's word for it because of his status as an expert will not suffice.[29]

As explained above, the affidavit checks all the boxes of being conclusory. The affidavit does not raise a fact issue on either prong of gross negligence.

The court of appeals also pointed to an affidavit by Raynee's mother, Robin, presumably as evidence of Marsillo's conscious indifference.[30] Robin's affidavit is included in the appendix to Raynee's brief to this Court, but it is not in the appellate record. Even if it were, it would not change our analysis. Robin's affidavit recounts her pleas for Raynee to be given antivenom before she was, the progression of swelling and bruising on Raynee's foot and leg between the time of her arrival and her first dose of antivenom, and the fact that the measuring and marking of Raynee's symptoms were performed by the nursing staff rather than by Marsillo personally. All of these facts are undisputed, but none is evidence that Marsillo acted with the conscious indifference required by the subjective prong of gross negligence.

To survive Marsillo's no-evidence motion for summary judgment, Raynee was required to adduce evidence that Marsillo should have

---

[29] *Id.* (cleaned up).

[30] *See* 654 S.W.3d at 230.

disregarded the Guidelines' detailed protocol and that her failure to do so showed that she was consciously indifferent to Raynee's health. Reviewing the evidence in the light most favorable to Raynee, crediting evidence favorable to her if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not[31]—all as we must—the evidence shows that Marsillo knew the significant risks of choosing when to administer antivenom to Raynee and was not indifferent to them but chose to follow the Guidelines. Marsillo's motion must be granted "unless the nonmovant raises a genuine issue of material fact on each element."[32] Raynee did not. The trial court correctly granted summary judgment for Marsillo.

*    *    *    *    *

We reverse the court of appeals' judgment and reinstate the trial court's summary judgment for Marsillo.

Nathan L. Hecht<br>
Chief Justice

**OPINION DELIVERED:** January 12, 2024

---

[31] *Boerjan*, 436 S.W.3d at 311-312 (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009)).

[32] *Id.* at 310; *see* TEX. R. CIV. P. 166a(i).