COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| GREGORY SAGE, | § | No. 08-14-00055-CV |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | County Court at Law No. 6 |
| | § | |
| JAMES R. HOWARD, M.D., | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC# 2009-4341) |
| | § | |

## **O P I N I O N**

Gregory Sage appeals from a summary judgment entered in favor of James R. Howard, M.D. We reverse and remand.

### **FACTUAL SUMMARY**

Gregory Sage, at the age of thirty-nine, had surgery to replace his left hip in March of 2006. Following the hip replacement surgery, he experienced dislocation of the hip on several occasions. Sage could not recall all of the dislocations, but he remembered three occasions when his hip became dislocated while he was simply standing or sitting. Dr. Jacob Heydemann, an orthopedic surgeon, concluded that the prosthesis used by Sage's previous surgeon was too small for a man of Sage's size[1] and he replaced it in March of 2007, but that prosthesis had to be

---

[1] Sage is six feet tall and weighed approximately 270 pounds at the time of his admission to Del Sol.

replaced on August 22, 2007 after Sage developed and was successfully treated for a MRSA infection.

On October 2, 2007, approximately five weeks after surgery, Sage woke up with pain in his left hip. The pain became more severe as the day progressed, so Sage, accompanied by his father, drove himself to Del Sol Medical Center's emergency room at approximately 6:49 p.m. The nurse who performed the initial assessment of Sage noted that he was in severe pain, had tremors in his left leg, and could not stand. According to the nurse's notes, Sage told her that he was tossing and turning in bed and he woke up with pain to his left hip.[2] Dr. Howard evaluated and treated Sage in the emergency room. Sage told Dr. Howard that he felt a "pop" when he moved across his bed and it felt "just like when his hip is out." He was in severe pain and had experienced similar pain in the past. Dr. Howard's differential diagnosis was fracture or hip dislocation. He was leaning heavily towards dislocation given Sage's symptoms and past medical history and because this was common in patients with a hip prosthesis. Dr. Howard noted that the left side of the pelvis and hip was tender to the touch and he could not "range his hip at all." Dr. Howard did not call Sage's treating physician, Dr. Heydemann, nor did he consult the on-call orthopedic specialist before attempting to reduce the dislocation.

Dr. Howard testified that he had never performed a hip reduction without first obtaining x-rays because an x-ray will show the location of the femoral head and whether there are any associated fractures. He ordered the x-rays of Sage's left hip and pelvis at 8:17 p.m. and the time-stamp on the x-rays indicates they were taken at 8:20, 8:28, and 9:03 p.m., but there is no summary judgment evidence establishing that the time-stamp is accurate. Dr. Howard stated in his interrogatory answers that he personally read the x-rays and also relied upon the radiologist

---

[2] Dr. Heydemann stated in Sage's medical history on October 3, 2007 that Sage "presented after a history of being startled and rolling over in bed, having acute pain in his left hip."

for a formal interpretation. Dr. Howard stated the following in the written emergency room record: "X-rays show a prosthesis. I may be able to convince myself that the ball could be overlying the socket. I do not see an overt dislocation."[3] He made no mention of the fractured femur in his report and his diagnosis stated only: "Left hip dislocation by history." The radiologist, who electronically signed the x-ray reports two days later on October 4, 2007, stated that there is a fracture of the upper medial aspect of the femur including the upper portion of the shaft adjacent to the lesser trochanter. The radiologist also noted there is a total left hip prosthesis in place but he did not mention a hip dislocation.

At 8:58 p.m., Sage signed the consent form authorizing anesthesia and Propofol was administered at 9:15 p.m. Dr. Howard immediately performed the reduction procedure after Sage was given the Propofol. A CT scan done after the procedure showed the same fracture seen in the x-rays. The following day, Sage was transferred from Del Sol to Las Palmas Medical Center at Dr. Heydemann's request and Dr. Heydemann surgically repaired the fractured femur by placing bands around the bone. Sage remained hospitalized for four days until October 7, 2007.

Sage filed suit alleging Dr. Howard fractured Sage's left femur while attempting to treat a "presumed dislocation." Dr. Howard filed a no evidence and traditional motion for summary judgment. The no evidence motion asserted that Sage could present no evidence that (1) Dr. Howard committed any act or omission that was a proximate cause of the fractured femur or that (2) Dr. Howard deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician in the same or similar circumstances with willful and wanton negligence. The traditional motion for summary judgment alleged that the summary judgment

---

[3] Dr. Howard made the emergency room record at the conclusion of his shift which ended at midnight that same evening.

evidence conclusively established that Dr. Howard did not commit any act or omission that was a proximate cause of the fractured femur because the fracture existed before Dr. Howard treated him for the dislocation. Sage filed a response challenging these grounds and attached evidence which he asserted raised fact issues. The trial court granted the summary judgment motion without specifying the exact grounds.

## NO EVIDENCE SUMMARY JUDGMENT

Dr. Howard moved for summary judgment on both no evidence and traditional grounds and the trial court's order granting summary judgment does not specify the basis for the ruling. *See* TEX.R.CIV.P. 166a(c), 166a(i). Under these circumstances, we must affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Insurance Company v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). When a party moves for summary judgment on both traditional and no evidence grounds, the appellate court should address the no evidence grounds first. *Merriman v. XTO Energy, Inc*., 407 S.W.3d 244, 248 (Tex. 2013). Consequently, we will begin with Issue Two which challenges the no evidence summary judgment grounds.

### Standard of Review

A no evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Wade Oil & Gas, Inc. v. Telesis Operating Co., Inc.*, 417 S.W.3d 531, 540 (Tex.App.--El Paso 2013, no pet.). Under this standard, we review the evidence in the light most favorable to the non-movant, credit evidence favorable to that party if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *King Ranch*, 118 S.W.3d at 751.

- 4 -

A trial court should grant a no evidence motion when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *King Ranch*, 118 S.W.3d at 751.

A genuine issue of material fact is raised if the non-movant produces more than a scintilla of evidence regarding the challenged element. *King Ranch*, 118 S.W.3d at 751. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch*, 118 S.W.3d at 751, *quoting Merrell Dow Pharmaceuticals, Inc. v Havner*, 953 S.W.2d 706, 711 (Tex. 1997). There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas*, 417 S.W.3d at 540; *Ianni v. Loram Maintenance of Way, Inc.*, 16 S.W.3d 508, 513 (Tex.App.--El Paso 2000, pet. denied). Evidence that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001); *Wade Oil & Gas*, 417 S.W.3d at 540.

*Elements of Medical Malpractice*

In a medical malpractice claim, the plaintiff must prove four elements: (1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Estrada v. Mijares*, 407 S.W.3d 803, 806 (Tex.App.--El Paso 2013, no pet.); *Moreno v. Quintana*, 324 S.W.3d 124, 129 (Tex.App.--El Paso 2010, pet. denied). To establish causation in a medical malpractice case, the plaintiff is required to show evidence of a "reasonable medical probability" or "reasonable probability" that his injuries were proximately

caused by the negligence of one or more defendants. *Park Place Hospital v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995). Proximate cause has two components: cause in fact and foreseeability. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013); *Tejada v. Gernale*, 363 S.W.3d 699, 709 (Tex.App.--Houston [1st Dist.] 2011, no pet.). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission the harm would not have occurred. *Park Place Hospital*, 909 S.W.2d at 511.

*Proximate Cause*

Dr. Howard's motion for summary judgment asserted there is no evidence he caused the fractured femur. Sage's summary judgment evidence consisted of the expert affidavit of Jacob Heller, M.D., and the records he reviewed which included the medical records of Del Sol Medical Center, Dr. Howard's emergency room record, the medical records of Las Palmas Medical Center, Dr. Howard's answers to interrogatories, Sage's deposition, Dr. Howard's deposition, and the affidavit of Sage's father, James Sage.

It is undisputed that Dr. Howard manipulated Sage's left leg during the hip reduction procedure. Dr. Howard testified that it is rare for a fracture to occur without a traumatic event and fracture is one risk of a hip reduction procedure. James Sage was present in the emergency room with his son and did not leave until Sage was admitted to the hospital. Dr. Howard sat on a chair at the foot of the bed, took Sage's foot over his shoulder and pulled the leg straight forward. At Dr. Howard's request, Sage was given another shot.[4] Dr. Howard then pulled

---

[4] This is consistent with Dr. Howard's emergency room record which stated that Sage was given 120 milligrams of Diprivan (Propofol) and initially had adequate sedation and analgesia but he had to be administered an additional 40 milligrams of Diprivan after he asked Dr. Howard to stop the reduction procedure due to pain. After the additional Diprivan was given, Dr. Howard proceeded with the hip reduction.

- 6 -

Sage's leg down and to the left and James heard a "crack, like a piece of wood snapping" and Sage moaned as though he was in pain.[5]

Dr. Heller concluded, based on his review of the records, that there is a reasonable inference that Dr. Howard fractured the left femur while attempting the reduction. He based this conclusion on the following: the most traumatic event to cause a fracture of the femur was when Dr. Howard was attempting the reduction as compared to the patient moving around in his bed; Dr. Howard stated that a non-traumatic fracture is rare and Sage had good bone; and Sage's father stated that he heard a crack like the sound of wood snapping when Dr. Howard made the second attempt at reduction by pulling the leg down and to the left.

Dr. Howard contends that Dr. Heller's expert opinion should be disregarded because it is not based on a reliable foundation. To be competent summary judgment evidence, an expert's testimony must be clear, positive, direct, credible, and free from contradiction. *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997). An expert's affidavit must also be based on a reliable foundation. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Dr. Howard argues that the expert opinion is based on an assumption that the fracture could have only been caused by one of two events, Sage moving around in the bed or the hip reduction procedure, "when it is just as likely that the event that caused the fracture occurred before Sage went to bed the day before he awoke in pain." The medical record does not contain any facts from which it could be concluded that some other event caused the fracture. Dr. Howard's argument is based on nothing more than conjecture. Dr. Heller based his expert opinion on the facts contained in the medical record. Consequently, we decline to hold that his opinion is not based on a reliable foundation.

---

[5] Dr. Howard stated in his emergency room record that when he made the second attempt to reduce the hip he "never did feel a pop" and Sage reported that he had "good improvement."

We understand Dr. Howard to argue that the trial court properly granted the no evidence summary judgment motion because the evidence conclusively established the opposite of the vital fact, i.e., the fracture existed before Dr. Howard attempted the hip reduction. He bases this argument on the x-rays which were made, according to the x-rays' timestamps, before the reduction procedure. Dr. Howard testified that he had never performed a reduction without first obtaining x-rays. He ordered x-rays of Sage's left hip and pelvis at 8:17 p.m. on October 2, 2007. The time-stamp on the x-rays indicate they were taken at 8:20, 8:28, and 9:03 p.m. and a femur fracture can be seen on those x-rays, but there is no evidence in the summary judgment record that the time-stamp is accurate. Dr. Howard performed the hip reduction at approximately 9:15 p.m. after Propofol was administered to Sage. Dr. Howard testified that Sage came into the emergency room with the femur fracture, but the emergency room record he created at the conclusion of his shift reflects that he diagnosed Sage with only a left hip dislocation and he made no mention of the femur fracture. In his brief, Dr. Howard dismisses his failure to diagnose the femur fracture by asserting that since he was "attempting to reduce the hip -- and not repair the fractured femur -- it is neither surprising nor relevant that he made no mention of the fracture." This contention is directly contrary to Dr. Howard's testimony that he would never attempt to reduce a dislocation without first obtaining an x-ray because it was important for him to know whether the patient also had an associated fracture as the reduction procedure could worsen the fracture.

Sage relied on Dr. Heydemann's statement in his medical records that the x-rays were performed post-reduction. Dr. Heydemann stated the following in the medical history he created on October 3, 2007:

> This is a 39-year-old male who presented after a history of being startled and rolling over in bed, having acute pain in his left hip. He was taken by ambulance

to Del Sol Medical center. Their report is that he had a dislocation of his left hip which they reduced and post-reduction x-rays, noted that there was a fracture of his hip. Did a computerized tomography scan confirming that and he has been transferred here.

It is apparent that Dr. Heydemann's conclusion that the x-rays were done post-reduction is drawn from the Del Sol medical records rather than from any personal knowledge of when the x-rays were actually performed. Nevertheless, he determined that the records showed the x-rays were performed post-reduction.

Sage also relies on his own testimony and his father's affidavit. James Sage stated in his affidavit that he did not leave the hospital until he learned that his son was going to be admitted to the hospital and taken to a room. With respect to the x-rays, he stated the following: "I have also been asked whether 1 saw that an x-ray was taken before Dr. Howard pulled on Greg's leg. I was with Greg the whole time until I left the hospital. At no time do I remember them taking an x ray of my son."

During Sage's deposition, the following exchange occurred:

[Dr. Howard's counsel]: Do you have any reason to dispute that the two x-rays taken at 2020 and 2040 were done before Dr. Howard attempted to reduce your hip dislocation?

[Sage]: Can you rephrase that question?

[Dr. Howard's counsel]: Yeah. Do you have any reason to believe that the two x-rays that we went over, Exhibits 5 and 6, that they weren't taken before he attempted to reduce your hip dislocation?

[Sage]: Yes. I do.

[Dr. Howard's counsel]: Okay. What's that?

[Sage]: Well, because for one thing, my leg hurt so bad, to slide those x-rays under me would have been just excruciatingly painful and I would have remembered that. *That didn't happen while I was awake*. [Emphasis added].

- 9 -

Sage testified that he was unconscious and did not remember anything which occurred after he was given Propofol.

Dr. Howard characterizes the testimony of Sage and his father as amounting to nothing more than an assertion that neither witness remembered the x-rays being made before the hip reduction procedure, and therefore, it amounts to no evidence. Dr. Howard cites *Rankin v. Union Pacific Railroad Company*, 319 S.W.3d 58 (Tex.App.--San Antonio 2010, no pet.) in support of his argument. In that case, a train struck a vehicle at a railroad crossing and the driver of the vehicle was killed. One of the plaintiff's negligence theories required him to prove that the train crew failed to sound the train's whistle and bell in a timely manner as required by statute. *Rankin*, 319 S.W.3d at 61. The railroad moved for summary judgment and the plaintiff submitted the affidavit of a witness who stated that he did "not remember hearing the train blow its horn before it hit the truck." *Id.* at 65. The court of appeals concluded that the affidavit amounted to no evidence because "[t]he fact that a witness does not remember hearing the whistle or horn sounding is not probative evidence of any failure to sound the train's whistle or horn." *Rankin*, 319 S.W.3d at 65.

We agree with Dr. Howard that the portion of James Sage's affidavit stating that he did not remember the x-rays being made while he was present is not probative evidence. The same cannot be said for Sage's testimony. Sage, unlike his father, did not merely state that he did not remember the x-rays being done before the hip reduction procedure. To the contrary, when asked why he believed the x-rays were not done before the hip reduction procedure, Sage affirmatively testified that he would have remembered the pain caused by the x-ray plates being placed beneath his hip and added, "That didn't happen while I was awake." Sage also testified that he was unconscious after the Propofol was administered and other evidence showed that

Dr. Howard performed the hip reduction immediately after Sage was given the Propofol. An inference can be drawn from Sage's testimony that the x-rays were not done before Dr. Howard performed the hip reduction.

Viewing the evidence in the light most favorable to Sage as we must, we conclude that reasonable minds could differ with respect to whether the x-rays were done before the reduction procedure. Further, Sage presented more than a scintilla of evidence that Dr. Howard fractured Sage's hip while performing the hip reduction. The trial court erred by granting summary judgment on this ground.

*Willful and Wanton Negligence*

Dr. Howard also alleged in his no evidence summary judgment motion that there is no evidence that he deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician in the same or similar circumstances with willful and wanton negligence. Section 74.153 of the Civil Practice and Remedies Code, titled "Standard of Proof in Cases Involving Emergency Medical Care," provides:

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful[6] and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.153 (West 2011).

---

[6] The Dallas Court of Appeals noted in *Gardner v. Children's Medical Center of Dallas* that "willful" is the preferred American spelling. *Gardner v. Children's Medical Center of Dallas*, 402 S.W.3d 888, 891 n.1 (Tex.App.--Dallas 2013, no pet.), *citing* Bryan A. Garner, *The Redbook: A Manual on Legal Style* 278 (2nd ed., Thomson/West 2006). We will use the American spelling in the opinion and will use the statutory spelling only in direct quotations.

Thus, Sage was required to prove that Dr. Howard deviated from the standard of care with willful and wanton negligence. The Fifth Court of Appeals in *Turner v. Franklin* construed Section 74.153 and, after reviewing legislature history and case authority which equates willful and wanton negligence with gross negligence, concluded that the Legislature intended "willful and wanton negligence" to mean gross negligence. *Turner v. Franklin*, 325 S.W.3d 771, 780-81 (Tex.App.--Dallas 2010, pet. denied). We agree with *Turner's* analysis and will follow it. *But see Benish v. Grottie*, 281 S.W.3d 184, 191-92 (Tex.App.--Fort Worth 2009, pet. denied)(in an expert report case, holding that Section 74.153 does not alter the standard of care, only the standard of proof at trial, and declining to equate willful and wanton negligence with gross negligence).

Gross negligence consists of both an objective and subjective component. *U-Haul International, Inc. v. Waldrip*, 380 S.W.3d 118, 137-38 (Tex. 2012); *Telesis/Parkwood Retirement I, Ltd. v. Anderson*, --- S.W.3d ----, 2015 WL 1285265, at *20 (Tex.App.--El Paso 2015, no pet.); *Forester v. El Paso Electric Company*, 329 S.W.3d 832, 837 (Tex.App.--El Paso 2010, no pet.); *see* TEX.CIV.PRAC.&REM.CODE ANN. § 41.001(11)(West 2015)(providing a definition of "gross negligence" related to damages). These components may be proven by circumstantial evidence. *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001); *Turner*, 325 S.W.3d at 781.

Under the objective component, the act or omission, when viewed objectively from the actor's standpoint, must depart from the ordinary standard of care to such a degree that it creates an extreme degree of risk of harming others, considering the probability and magnitude of the potential to harm others. *Turner*, 325 S.W.3d at 781, *citing Columbia Medical Center of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Lee Lewis Construction*, 70 S.W.3d at

- 12 -

785. The defendant's conduct must create an extreme degree of risk. *Turner*, 325 S.W.3d at 781. This does not mean a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Lee Lewis Construction*, 70 S.W.3d at 785; *Turner*, 325 S.W.3d at 781.

Under the subjective component, the actor must have actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others. *Turner*, 325 S.W.3d at 781, *citing Hogue*, 271 S.W.3d at 248. It is the plaintiff's burden to show that the defendant knew about the peril but his acts or omissions demonstrate that he did not care. *Louisiana-Pacific Corporation v. Andrade*, 19 S.W.3d 245, 246-47 (Tex. 1999); *Telesis/Parkwood Retirement I, Ltd.*, --- S.W.3d ----, 2015 WL 1285265, at *20.

We have already determined that there is more than a scintilla of evidence that the x-rays were not done before Dr. Howard performed the hip reduction procedure. Dr. Heller stated in his expert affidavit that the standard of care under the same or similar circumstances for an individual who had multiple prior dislocations which could not be reduced in the emergency department and had to be treated in the operating room, includes: ordering left hip and lower extremity radiology studies, properly reading the x-rays; and immediately consulting with an orthopedic surgeon. Additionally, he stated that even assuming that reduction of a dislocation is appropriate in the emergency room, only one attempt should be made and if it is unsuccessful, the patient should be taken to the operating room for a second attempt under general anesthesia. He also concluded that Dr. Howard deviated from the standard of care in three ways: (1) he performed the reduction without an orthopedic consultation; (2) he failed to order the proper radiology studies before the attempted reduction; and (3) he used excessive force during the second attempt which fractured the femur.

Dr. Heller's affidavit also addressed gross negligence. His review of the medical records and deposition testimony showed that Dr. Howard knew that it is prudent for an emergency physician to take an x-ray before an attempted reduction, a fractured femur is serious, a hip reduction may cause a fracture, applying the wrong force could cause a fracture during the reduction, and if there is an existing fracture it can worsen with an attempted reduction especially when making a second attempt. He also noted that Dr. Howard stated during his deposition that it takes a lot of force to reduce a dislocated hip. In Dr. Heller's opinion, Dr. Howard's conduct involved a high likelihood or extreme risk of serious injury to Sage, i.e., a fractured femur.

With respect to the "extreme risk" or objective component, there is no evidence, or less than a scintilla of evidence, that Dr. Howard's failure to first obtain an orthopedic consultation before performing the hip reduction created an extreme risk of injury. Dr. Heller certainly stated that failure to obtain an orthopedic consultation constitutes a breach of the standard of care, but he did not state, and Sage presented no other evidence from which it can be inferred, that this omission created a likelihood of serious injury, including fracture. Some evidence of simple negligence is not evidence of gross negligence. *Lee Lewis Construction*, 70 S.W.3d at 785. The trial court properly granted summary judgment with respect to this theory of negligence.

Dr. Heller and Dr. Howard agreed that x-rays should be taken prior to a hip reduction procedure. Dr. Howard explained that x-rays are used to determine where the femur ball is located because this knowledge makes the reduction easier. X-rays are also used to determine whether there are any associated fractures because an existing fracture can be made worse by the reduction procedure. Dr. Howard testified that a fracture can result from using the "wrong force" during the procedure. Similarly, Dr. Heller's affidavit stated that using excessive force could cause a fracture. In Dr. Heller's opinion, Dr. Howard's conduct involved a high likelihood

or extreme risk of serious injury to Sage, i.e., a fractured femur. There is some evidence from which it could be found that Dr. Howard failed to obtain radiological studies before attempting the reduction and he used excessive force during the reduction procedure. We conclude that there is more than a scintilla of evidence that failing to obtain radiological studies prior to performing a hip reduction procedure and using excessive force to reduce the dislocation created an extreme risk of causing a fracture and such a risk is apparent to anyone in Dr. Howard's position.

We will next examine the "actual awareness" or subject component of gross negligence. As noted in Dr. Heller's affidavit, Dr. Howard knew that it is prudent for an emergency physician to take an x-ray before attempting a hip reduction, a fractured femur is serious, a hip reduction may cause a fracture, applying the wrong force during the reduction could cause a fracture, and if there is an existing fracture it can worsen with an attempted reduction especially when making a second attempted reduction. Dr. Howard stated during his deposition that it takes a lot of force to reduce a dislocated hip. Despite his knowledge of the risk of fracture, there is more than a scintilla of evidence Dr. Howard performed the hip reduction without an x-ray and used excessive force during the second attempted reduction. We conclude there is more than a scintilla of evidence that Dr. Howard chose to proceed in conscious indifference of Sage's rights, safety, or welfare. Issue Two is sustained.

## TRADITIONAL SUMMARY JUDGMENT

In his first issue, Sage argues that the trial court erred by granting Dr. Howard's motion for traditional summary judgment because there is a fact issue whether Dr. Howard caused the femur fracture.

*Standard of Review*

- 15 -

A defendant is entitled to traditional summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's cause of action or if it conclusively establishes all elements of an affirmative defense. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). The standard of review for traditional summary judgment is well established. *Nixon v. Mr. Property Management Company, Inc*., 690 S.W.2d 546, 548 (Tex. 1985). The moving party carries the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex.App.--El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99. Once the movant establishes its right to summary judgment, the burden then shifts to the non-movant to present evidence which raises a genuine issue of material fact, thereby precluding summary judgment. *See City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979).

In his traditional summary judgment motion, Dr. Howard asserted that Sage could not prove that he committed an act which proximately caused the injury because the evidence conclusively established that the injury existed before he performed the hip reduction. He relied on the evidence showing that the x-rays of Sage's hip which depicted the femur fracture were made prior to the reduction procedure. We found in our review of Issue One that Sage presented more than a scintilla of evidence that the x-rays were not taken before the hip reduction

procedure. This same evidence creates a fact issue sufficient to preclude summary judgment. Issue One is sustained. Having sustained both issues presented on appeal, we reverse the summary judgment and remand the cause for further proceedings consistent with this opinion.


June 17, 2015

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Hughes, J., and Larsen, (Senior Judge)
Larsen, Senior Judge (Sitting by Assignment)