# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00296-CV

---

**Robin Dunnick, Individually, and as Next Friend to Raynee Dunnick, and Dana Dunnick, Appellants**

**v.**

**Kristy Marsillo, D.O., Appellee**

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-007132, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING

---

## O P I N I O N

Robin Dunnick, individually and as next friend to Raynee Dunnick, and Dana Dunnick (collectively, the Dunnicks) appeal the trial court's order granting summary judgment and dismissing their healthcare liability claim against Kristy Marsillo, D.O.[1]  Because we conclude there is more than a scintilla of probative evidence to show that Dr. Marsillo acted with "willful and wanton negligence" and that her acts or omissions proximately caused injury, we will reverse the trial court's summary judgment and remand for further proceedings.

## BACKGROUND

The Dunnicks filed suit after their thirteen-year-old daughter, Raynee, was treated at Seton Medical Center Hays ("Seton Hays") on September 26, 2018, for a rattlesnake bite.

---

[1]  Because several of the parties share the same last name, for clarity, we will refer to these parties by their first names when referring to them individually.

Raynee was bitten by the rattlesnake on her left foot while in her family's yard and was transported by EMS to the emergency room at Seton Hays. The EMS records show that the snakebite occurred at approximately 8:20 p.m., and Raynee arrived at Seton Hays at 9:14 p.m. Within a few minutes, Raynee was triaged and assessed by nursing staff and then seen by the attending physician, Dr. Marsillo.

At approximately 9:22 p.m., Dr. Marsillo issued initial orders that included administering an EKG, starting two IVs, and obtaining a urinalysis. In addition, she also issued orders for lab work and blood-coagulation studies and for the nursing staff to measure and mark any progression of the bite site (for signs of pain and swelling) every thirty minutes. At approximately 11:50 p.m., Dr. Marsillo ordered six vials of CroFab (antivenom) for Raynee. At 12:29 a.m., a little more than four hours after Raynee was bitten and three hours after she arrived at the emergency room, the antivenom began infusing. During this time, Dr. Marsillo secured a transfer and overnight admission for Raynee at Dell Children's Medical Center.

Raynee was discharged from Seton Hays at 1:02 a.m. on September 27 and transferred to Dell Children's Medical Center, where she received additional vials of antivenom. In total, Raynee received 37 vials of antivenom during the course of her treatment. She was discharged on September 28, with instructions for at-home physical therapy exercises and orders to keep her leg elevated until the swelling subsided.

In their petition, the Dunnicks alleged that Dr. Marsillo failed to exercise the appropriate standard of care for treating Raynee's snakebite injury.[2] In addition, the Dunnicks alleged that Dr. Marsillo's negligence, including the three-hour delay of the administration of

---

[2] The Dunnicks also filed suit against Seton Hays but later settled their claims against the hospital. As a result, Seton Hays is not a party to this appeal.

antivenom upon Raynee's arrival to the emergency room, caused further complications, such as permanent impairment, disfigurement, and ongoing pain and suffering.

Dr. Marsillo filed a no-evidence motion for summary judgment on the ground that there was no probative evidence that she acted with willful and wanton negligence in treating Raynee or that Raynee's injuries were proximately caused by Dr. Marsillo's negligence. *See* Tex. R. Civ. P. 166a(i). Following a nonevidentiary hearing, the trial court granted summary judgment in favor of Dr. Marsillo. This appeal followed.

## STANDARD OF REVIEW

After adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020); *see* Tex. R. Civ. P. 166a(i). Once the motion is filed, the burden shifts to the nonmovant to produce summary-judgment evidence raising a genuine issue of material fact on the challenged element. *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020). A trial court properly grants a no-evidence summary judgment if the nonmovant produces no more than a scintilla of probative evidence—that is, if the nonmovant's evidence does not rise to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018).

We review a trial court's ruling on summary judgment de novo. *Traveler's Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). In conducting that review, we examine the entire record in the light most favorable to the nonmovant, crediting evidence a reasonable juror could

credit and disregarding contrary evidence unless a reasonable juror could not. *Merriam v. XTO Energy, Inc.,* 407 S.W.3d 244, 248 (Tex. 2013). When, as here, the trial court does not specify the grounds for its summary-judgment ruling, we must affirm if any ground on which summary judgment was sought has merit *Id.*

## ANALYSIS

To prevail on a claim for medical negligence, a plaintiff is required to prove "(1) a duty by the healthcare provider to act according to a certain standard, (2) a breach of the applicable standard of care, (3) an injury, and (4) a sufficient causal connection between the breach of care and the injury." *Miller v. Mullen*, 531 S.W.3d 771, 778-79 (Tex. App.—Texarkana 2016, no pet.); *Sage v. Howard*, 465 S.W.3d 398, 407 (Tex. App.—El Paso 2015, no pet.). In addition, in certain suits involving healthcare liability claims arising out of the provision of emergency medical care, the legislature has heightened the standard of proof. Tex. Civ. Prac. & Rem. Code § 74.153; *Jones v. Baylor Scott & White Health*, No. 07-19-00387-CV, 2020 Tex. App. LEXIS 9150, at *6 (Tex. App.—Amarillo Nov. 20, 2020, no pet.) (mem. op.). Section 74.153 of the Texas Civil Practice and Remedies Code, in relevant part, states:

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department, . . . the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with *willful and wanton negligence*, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem. Code § 74.153 (emphasis added).

4

Here, there is no dispute that the Dunnicks's suit against Dr. Marsillo involves a healthcare liability claim arising out of the provision of emergency medical care and that their suit is governed by Section 74.153. Consequently, Dr. Marsillo moved for summary judgment on the grounds that there is no probative evidence to show that (1) she acted with willful and wanton negligence in providing treatment to Raynee, or (2) a causal connection exists between the breach of the standard of care and any of Raynee's injuries. On appeal, the Dunnicks assert that the trial court erred to the extent it granted summary judgment in favor of Dr. Marsillo on either of these grounds. On review, we will first consider whether there is any probative evidence of willful and wanton negligence.

*Evidence of Willful and Wanton Negligence*

Although the statute does not define "willful and wanton negligence," the Dallas court of appeals has interpreted the phrase to mean "gross negligence." *Turner v. Franklin*, 325 S.W.3d 771, 780–81 (Tex. App.—Dallas 2010, pet. denied) ("We conclude the legislature intended 'wilful and wanton negligence,' as used in [section 74.153], to mean 'gross negligence.'"). In reaching this conclusion, our sister court reviewed the statute's legislative history as well as cases construing the phrase "willful and wanton" in the context of other statutes. *Id.* Because we agree with the court's analysis in *Turner*, we join those courts of appeals that have followed *Turner* and conclude that the legislature intended the phrase "willful and wanton negligence," as used in Section 74.153, to mean "gross negligence." *Martinez-Gonzalez v. EC Lewisville, LLC*, No. 02-17-00122-CV, 2018 Tex. App. LEXIS 1800, at *15 (Tex. App.—Fort Worth Mar. 8, 2018, pet. denied) (mem. op.) (following *Turner*); *Ho v. Johnson*, No. 09-15-00077-CV, 2016 Tex. App. LEXIS 1668, at *33−34 (Tex. App.—Beaumont

5

Feb. 18, 2016, pet. denied) (mem. op.) (same); *Sage*, 465 S.W.3d at 407 (same); *see also Miller*, 531 S.W.3d at 779 n.7 ("For purposes of analyzing this summary judgment, we assume the *Turner* definition of the willful and wanton standard, as urged by both parties.").

Gross negligence is comprised of two elements—one subjective and one objective. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *Turner*, 325 S.W.3d at 781. For the objective element, we consider whether the defendant's acts or omissions departed from the standard of care "to such an extent that it creates an extreme degree of risk of harming others, considering the probability and magnitude of the potential harm to others." *Turner*, 325 S.W.3d at 781 (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008)). "Extreme risk" does not mean a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Sage*, 465 S.W.3d at 407. In examining the subjective component, we focus on the defendant's state of mind, examining whether she knew about the peril caused by her conduct and continued to act in a way that demonstrated she did not care about the consequences. *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) ("What separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care."); *Martinez-Gonzalez*, 2018 Tex. App. LEXIS 1800, at *17 ("[W]e look for evidence of the defendant's subjective mental state rather than the defendant's exercise of care." (citing *Turner*, 325 S.W.3d at 784)); *Sage*, 465 S.W.3d at 407. A plaintiff may establish the defendant's state of mind by circumstantial evidence. *Martinez-Gonzalez*, 2018 Tex. App. LEXIS 1800, at *17. To raise a fact issue regarding willful and wanton negligence, there must be legally sufficient evidence that the defendant had actual, subjective

6

awareness that the conditions constituted an extreme degree of harm but the defendant nevertheless was consciously indifferent to the rights, safety, or welfare of others. *Ho*, 2016 Tex. App. LEXIS 1668, at * 7.

In their response to Dr. Marsillo's motion for summary judgment, the Dunnicks asserted that there is a genuine issue of material fact as to whether Dr. Marsillo was grossly negligent in failing to order the administration of antivenom to Raynee when she was admitted to the Seton Hays emergency room because when she presented, she was showing obvious signs of envenomation, such as swelling, pain, and bruising. In support of this contention, the Dunnicks attached the affidavit of Robin Dunnick, Raynee's mother. In her affidavit, Robin explains that Raynee presented at Seton Hays emergency room after being bitten by a rattlesnake and that "the dead rattlesnake was brought into the emergency room to substantiate that it was, in fact, a venomous snake that bit her." Robin also states that Raynee's leg was swelling and bruising and that she "begged and pleaded for Raynee to be provided antivenom," but "Dr. Marsillo did not order any antivenom until Raynee was being transferred," hours later. While in the Seton Hays emergency room, Robin "took pictures with her cell phone of [Raynee's] symptoms getting worse." Approximately one hour after Raynee's admission, Robin took the following photo, marking the swelling and bruising as it progressed up Raynee's foot, ankle, and leg:



Approximately three hours after admission, Robin took the following photo:



The Dunnicks also attached the affidavit of Dr. Benjamin Abo, a physician who is an expert in the field of emergency medicine and toxinology, "the practice and study devoted to

toxins from living things, such as fauna and flora." In his affidavit, Dr. Abo states that snake envenomation is a time-sensitive emergency and that only the administration of antivenom can stop the progression and toxic effects of venom, which can include not only mortality but also permanent pain, disability, and disfigurement. "The object is to, as soon as possible gain control of a bite as defined by no progression of local findings (pain, tenderness, skin changes), lab abnormalities trending toward normal, and complete resolution of any systemic signs." Thus, according to Dr. Abo, the standard of care in this case required "Dr. Marsillo to have evaluated and examined Raynee for life threats, systematic signs of envenomation, abnormal vital signs signaling envenomation, both locally or systematically, and for any progression of local findings, including ecchymosis, swelling, oozing, pain, or tenderness." Although Dr. Marsillo's initial exam noted "obvious signs of envenomation," she did not order or administer antivenom. In addition, "progression from the bite site indicating local findings spreading/progressing up more and more proximally was evidenced by Robin Dunnick's photographs."

According to Dr. Abo's affidavit testimony, "[i]mmediate administration of antivenom was necessary for Raynee once she exhibited signs of envenomation. To not immediately administer antivenom is negligent and falls below the standard of care for an emergency medicine physician." In addition, Dr. Abo opines, "Dr. Marsillo had the subjective awareness that [Raynee] had been envenomated by the rattlesnake and acted consciously indifferent to administering antivenom. . . . A reasonable ER physician would eliminate the extreme risk of harm that venom causes the body by immediately administering antivenom to Raynee upon her admission."

In response, Dr. Marsillo contends that the Dunnicks's summary-judgment evidence fails to create a fact issue as to whether, objectively, there was an extreme risk posed by

her failure to immediately administer antivenom and whether, subjectively, she was aware of a risk of injury and deliberately chose to ignore it. Dr. Marsillo asserts that, to the contrary, the undisputed medical record, which she attached in support of her motion for summary judgment, shows that she "immediately evaluated, re-evaluated, and treated [Raynee's] snakebite, and decided when to give antiven[om] in accordance with the snakebite treatment guidelines that was the standing protocol at Seton [Hays] for the treatment of snakebites." These snakebite treatment guidelines, recorded in the medical records as "ED Snakebite," utilize a system that evaluates and scores six categories pertaining to the patient's state of health following the snakebite (including pulmonary symptoms, cardiovascular system, local wound, gastrointestinal system, hematologic symptoms, and central nervous system). Each of these categories are evaluated, scored for their current severity, and totaled to obtain the patient's "severity score." Under this algorithm, if the patient's coagulopathy labs are normal and the severity score is three or less, antivenom is not administered. In that case, the patient would be observed and reassessed to determine if there are any changes to labs or symptoms that would require an adjustment to the score.

Dr. Marsillo points out that, according to the medical record, the hospital staff's initial assessment of Raynee revealed normal neurologic, respiratory, coagulation studies, and cardiovascular systems. In light of this assessment, Dr. Marsillo recorded Raynee's severity score as a two, which meant that the criteria for the administration of antivenom as per the snakebite treatment guidelines were not met. Thereafter, the nursing staff continued to monitor Raynee, take additional vitals, and measure the swelling of her foot and leg every 15 to 30 minutes as ordered by Dr. Marsillo. At 10:38 p.m., Raynee began feeling a burning sensation in her toe, and Dr. Marsillo arrived to reevaluate her condition at 11:20 p.m. Dr. Marsillo increased

10

Dunnick's total severity score to a three, which is still below the criteria for the administration of antivenom. In addition, Dr. Marsillo ordered repeat coagulation labs. The lab results came back at 11:39 p.m., showing a drop in platelets and a decrease in Raynee's Fibrinogen level (a protein that helps to form blood clots). As a result, Dr. Marsillo added two points to Raynee's severity score, increasing the total score from three to five and, based on that score, ordered that Raynee receive antivenom treatment. Dr. Marsillo asserts that the undisputed medical record shows that she followed the hospital's snakebite treatment guidelines in treating Raynee, including the timing of her decision to order antivenom, and that "[f]ollowing a hospital's policy for an emergent condition is no evidence of a conscious indifference to that very same condition."

To the extent Dr. Marsillo suggests that adherence to a hospital's treatment protocols or guidelines necessarily negates a physician's subjective awareness of risk in every case, we disagree. *See Turner*, 325 S.W.3d at 784 ("Evidence of 'some care' will not disprove gross negligence as a matter of law."). A hospital is an institution licensed to provide health care, but only a licensed doctor can provide medical care. *Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016); *see Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 413 (Tex. App—Fort Worth 2003, no pet.) (explaining that in Texas, "medical decisions are to be made by attending physicians" and that "[a] hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions"). Therefore, although Dr. Marsillo's adherence to Seton Hays's snakebite treatment guidelines may explain why she decided to wait three hours after Raynee's admission to order antivenom treatment in this case, it does not negate the possibility that, objectively, her adherence to the guidelines posed an extreme risk of harm to Raynee or that, subjectively, she was aware of that risk. As previously discussed, Dr. Abo opines in his affidavit that snake envenomation is

11

a time-sensitive emergency, that only the administration of antivenom can stop the progression and effects of the venom, and that the failure to do so can cause permanent injury to the patient. Similarly, in her deposition testimony, which the Dunnicks also attached to their summary-judgment response, Dr. Marsillo acknowledged that Raynee was exhibiting signs of envenomation upon her admission to the emergency room, including bruising, swelling, and pain; that rattlesnake envenomation is a time-sensitive emergency; and that while antivenom is not a "cure," it is the only treatment available to prevent envenomation from spreading. Nothing in the evidence suggests, and Dr. Marsillo does not contend, that the decision to delay administering antivenom for three hours was necessary in light of some countervailing risk. *See Miller*, 531 S.W.3d at 780−81 (concluding that although physician was aware of risk created by administering aspirin to patient who could be experiencing hematoma, he was not consciously indifferent to that risk because patient was exhibiting symptoms of heart attack, and aspirin is part of standard heart-attack-prevention protocol).

Viewing the summary-judgment evidence in the light most favorable to the Dunnicks, including Dr. Abo's affidavit, Robin Dunnick's affidavit, and Dr. Marsillo's deposition testimony, we conclude that there is a genuine issue of material fact as to whether adherence to the Seton Hays snakebite treatment guidelines poses an extreme risk of harm to patients who, like Raynee, exhibit signs of envenomation hours before their severity score under the guidelines reaches the minimum threshold necessary for the administration of antivenom. In addition, there is more than a scintilla of probative evidence suggesting that Dr. Marsillo was aware of that risk but nevertheless adhered to the guidelines and, consequently, failed to promptly order antivenom for Raynee. To the extent the trial court granted summary judgment

in favor of Dr. Marsillo on the ground that there was no evidence of "willful and wanton negligence," we conclude that the trial court erred.

*Evidence of Causation*

Next, we consider whether the trial court erred in granting summary judgment on the ground that there is no probative evidence as to whether Dr. Marsillo's negligence caused Raynee's complained-of injury. Proximate cause is an essential element of a medical-negligence claim and consists of (1) cause in fact, and (2) foreseeability. *Windrum v. Kareh*, 581 S.W.3d 761, 777 (Tex. 2019) (citing *Bustamonte v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). Foreseeability requires only that the defendant should have anticipated that his negligent act or omission would create danger or harm for others; it does not require the defendant to have actually anticipated the precise manner in which the injury would have occurred. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). To establish cause in fact, the plaintiff must show by a preponderance of the evidence that the defendant's negligent conduct "was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Bustamante*, 529 S.W.3d at 456 (citation omitted). Consequently, the plaintiff must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability'" that the defendant's negligence caused the plaintiff's injury—that is, it must be "'more likely than not' that the ultimate harm or conditions resulted from such negligence." *Id.* (quoting *Jelinek v. Casas*, 328 S.W.3d 526. 532-33 (Tex. 2010)).

Expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). "A conclusory statement of causation is inadequate; instead,

13

the expert must explain the basis of his statements and link conclusions to specific facts.*"* *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018).  In addition, "when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion." *Jelinek*, 328 S.W.3d at 536.

The Dunnicks assert that there is a genuine issue of material fact as to whether Dr. Marsillo's negligence in failing to administer the antivenom when Raynee was first admitted at Seton Hays emergency room proximately caused her to suffer long-term pain and impairment. In support of this contention, the Dunnicks rely on Dr. Abo's affidavit.  As previously discussed, Dr. Abo stated that by not immediately administering antivenom when envenomation was first observed in Raynee, Dr. Marsillo's treatment fell below the applicable standard of care.  As to causation, Dr. Abo explained, in relevant part:

> The only cure for envenomation is antivenom, which can only stop the ongoing effects of the venom and not reverse local progressive issues.  The point of providing antivenom when appropriate is not only to fight mortality, but also to fight significant morbidity including permanent pain, permanent disability, permanent disfigurement.  Outcomes are best when definitive management occurs as soon as possible, especially with rattlesnakes.
>
> . . .
>
> The significant delay of care led to a significantly increased amount of antivenom needed to regain control of Raynee's medical condition.  Raynee not only had a further protracted hospital stay and requirement for larger repeat doses of antivenom to gain control, but she also has irreversible pain, skin, and nerve damage . . . which would not have been incurred but for the delay in the administration of antivenom.
>
> . . .

14

Based upon my review of the above-mentioned medical records and bills, as well as my training, knowledge, and experience in the field of Emergency Medicine, EMS, toxinology, and wilderness/austere medicine, my personal interview of Raynee's mother, Robin Dunnick, as well as documented in these citations for information on the standards of care [citations omitted], with a reasonable degree of medical probability, it is my expert opinion that Raynee's permanent damages to her leg and financial burden . . . [were] directly attributable to the delay in Raynee receiving antivenom immediately upon admission to Seton Hays Hospital.

Viewed in the light most favorable to the Dunnicks, Dr. Abo's affidavit establishes that the risk of permanent physical injury increases the longer envenomation is allowed to proceed and that, therefore, the failure to receive antivenom for three hours after her arrival at Seton Hays more likely than not caused Raynee's injury or, at least, caused her injury to be worse than it would have been had she received antivenom when her envenomation symptoms were first noted. We conclude that the summary-judgment record contains more than a scintilla of probative evidence to show that Raynee's complained-of injuries were a foreseeable consequence of Dr. Marsillo's failure to promptly administer antivenom. Consequently, the trial court erred in granting summary judgment on the ground that there was legally insufficient evidence to support the element of proximate cause.

## CONCLUSION

Because we conclude that the trial court erred in granting summary judgment in favor of Dr. Marsillo on any of the grounds raised in her motion for no-evidence summary judgment, we reverse the judgment of the trial court and remand the case for further proceedings.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Reversed and Remanded

Filed: August 31, 2022